**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

TRACY CANNON, *Administratrix of the Estate of Mark Cannon, Jr.*,

          Plaintiff,

- v -                Civ. No. 9:15-CV-1417
                    (GLS/DJS)

CORRECTIONAL MEDICAL CARE, INC., *et al*,

          Defendants.
_____

**DANIEL J. STEWART**
**United States Magistrate Judge**

### MEMORANDUM-DECISION AND ORDER

The New York State Commission of Correction, by its General Counsel, moves to quash a deposition subpoena issued upon it by Counsel for the Plaintiff. Dkt. No. 93.[1] Plaintiff's Counsel opposes the Motion, and has submitted his Affidavit, as well as a Memorandum of Law. Dkt. Nos. 101 & 101-2. General Counsel for the Commission of Correction then submitted an Affirmation in Response. Dkt. No. 120. For the reasons that follow, the Commission of Correction's Motion is **granted** and the subpoena issued to it is hereby quashed.

### I. BACKGROUND

The New York State Commission of Correction was established as part of the Constitution of the State of New York, and is charged, in part, with inspection of facilities used for detention of inmates. Aff. of Brian Callahan, Esq., at ¶ 3; New York State Constitution, Article XVII, Section 5. The Commission consists of three persons appointed by the Governor, with the advice and

---

[1] The moving papers consist of the Notice of Motion, Dkt. No. 93; Affidavit of General Counsel Brian Callahan, Dkt. No. 93-1; Exhibits A-F, Dkt. No. 93-2 – Exhibit A, Report of Inmate Death; Exhibit B, Final Report of the New York State Commission of Correction; Exhibit C, the subpoena to testify; Exhibits D-E, revised subpoenas; and Exhibit F, Commission of Correction written objection to the subpoena –; and a Memorandum of Law, Dkt. No. 93-3, with Exhibits A-C, Dkt. No. 93-4.

consent of the New York State Senate. NEW YORK CORRECT. LAW § 41(1). As part of its responsibilities, the Commission of Correction reviews issues concerning the health and safety of inmates. Callahan Aff. at ¶ 4. The Commission also consists of a Medical Review Board that is required by statute to "investigate and review the cause and circumstances surrounding the death of any inmate at a correctional facility." NEW YORK CORRECT. LAW §§ 43(1) & 47(1)(a). The Medical Review Board consists statutorily of six uncompensated members who are appointed by the Governor of New York and confirmed by the Senate, and includes a licensed physician; a board certified forensic pathologist; and an attorney. *Id*. at § 43. The Medical Review Board prepares and submits a report to the Commission of Correction, which then issues a final report and, if appropriate, makes recommendations to the facility or other interested individuals. *Id*. at § 47.

On August 30, 2014, Mark Cannon died while in the custody of the Albany County Sheriff. Callahan Aff. at ¶ 8, & Ex. A, Report of Inmate Death. That death was then reported to the New York State Commission of Correction. Upon the report of the death of Mark Cannon, the Commission's Medical Review Board began an investigation and the Commission ultimately issued a Final Report on June 28, 2016. Callahan Aff., Ex. B, Final Report of the New York State Commission of Correction. That Final Report, signed by Commissioner Phyllis Harrison-Ross, M.D., is comprehensive and its recommendations are stark. *Id*. It details Mr. Cannon's personal history and his arrest for possession of a weapon and resisting arrest on July 23, 2014, which brought him into the custody of the Albany County Jail. *Id*. at p. 2.[2] At that time, medical care at the Albany County Jail was provided, pursuant to contract, by Correctional Medical Care, Inc., which supplied

---

[2] The Final Report of the Death of Mark Cannon, an Inmate at the Albany CJ, is eight pages in length, and reference is made to the page numbers listed on the top right hand corner of the Report.

various medical staff, including nurses. *Id.* at pp 2 & 7; *see also* Dkt. No. 52, Am. Compl. at ¶¶ 6, 10, & 11.

On August 26, 2014, at 4:12 p.m., Mr. Cannon reported to his housing unit officer that he was dizzy. Callahan Aff., Ex. B, Final Report of the New York State Commission of Correction, at p. 3. Mr. Cannon was not seen by medical, but the correctional staff was told to advise Mr. Cannon to drink water and lie down. *Id.* At 5:10 p.m., Mr. Cannon reported that he was incapable of standing or walking. *Id.* He was then seen by the nursing staff on the housing unit. *Id.* Mr. Cannon was placed in a wheelchair and wheeled to medical. *Id.* He was provided Gatorade. *Id.* at p. 4. Mr. Cannon's condition progressively worsened and he was seen vomiting into the toilet. *Id.* The Report indicates that the nurse at that time ("C.G.") failed to do a proper nursing assessment, and did not assess "his obvious neurological deficit." *Id.* In addition, the nurse failed to notify the facility doctor that Mr. Cannon had been admitted into the infirmary observation room, and that such a failure to notify was a violation of the policies of Correctional Medical Care. *Id.*

Mr. Cannon was returned to his housing unit 8:32 p.m., and was seen on video with an unsteady gait and holding onto the walls of the hallways. *Id.* He continued to voice complaints of dizziness, and requested to be seen by medical, but the nurses refused to do so and merely provided the instruction to Mr. Cannon to drink water. *Id.*

According to the Final Report, at 3:10 a.m., on August 27, 2014, Mr. Cannon was found lying on the floor of the cell, he was not verbally responsive, and he was foaming at the mouth. *Id.* at p. 5. He was then wheeled to medical and placed in an infirmary room, where he was left half-on and half-off of a mattress located on the floor, with his arm tucked underneath him. *Id.* At that time, the attending nurse ("K.C.") threw a blanket by Mr. Cannon's head, and left the room. *Id.* Once

again the facility doctor was not notified, as required by Correctional Medical Care's policy. *Id.* In addition, the Commission specifically notes that nurse K.C "failed to conduct a basic nursing and neurological assessment on a patient with obvious signs and symptoms of a neurological crisis." *Id.*

Mr. Cannon was left in the same position until 4:30 a.m. *Id.* At that point he was attended to by nurse K.C., who then finally called the facility doctor; the doctor immediately ordered that the inmate be brought to the Albany Memorial Hospital via emergency squad. *Id.* At 4:57 a.m., Colonie EMS arrived at the Albany County Jail and Mr. Cannon was transported to Albany Memorial Hospital in critical condition. *Id.* at p. 6. As a result of suffering a brain stem stroke and cerebral strokes, Mr. Cannon was declared dead on August 30, 2014. *Id.*

The Commission of Correction Final Report was highly critical of the care, or notably the lack of care, provided to Inmate Mark Cannon by the Albany County Jail's medical staff, and in particular two nurses employed by Correctional Medical Care, Inc. As the Commission noted:

> For over a 12-hour period, Mark Cannon had a progressively deteriorating neurological situation that was completely disregarded by nursing staff despite dramatic signs and symptoms of an active neurological emergency and Cannon's repeated requests for medical care. In this matter, there was a total failure of the Registered Nurses to perform adequate nursing assessments and neurological nursing assessments on the patient, failure to recognize dramatic signs of a life threatening neurological emergency, failure to request physician assistance or emergency care, and a failure to follow the policies and procedures of the contracted medical provider Correctional Medical Care, Inc.

*Id.* at p. 2.

As summarized by the Commission:

> The Medical Review Board has found the medical care provided to Cannon was so grossly inadequate demonstrating a callous disregard of a patient in a life threatening condition that it shocks the conscience.

*Id.*

The Final Report recommended to Correctional Medical Care, Inc., that, among other things, Nurse K.C. be terminated and reported to the New York State Department of Education, Office of the Professions, and that it also conduct a review of the conduct of Nurse C.G. *Id.* at p. 6. The Final Report also recommended to the Albany County Legislature that it undertake an inquiry as to whether in light of the "grossly inadequate care delivered in this case and the grossly inadequate medical oversight and supervision, Correctional Medical Care, Inc. is fit to provide medical and mental health care at the Albany County jail or should be terminated for cause." *Id.* at p. 7.

After the Report was issued in preliminary form, Correctional Medical Care, Inc., was given an opportunity to respond. While Correctional Medical Care's May 5, 2016 response was not provided with the present Motion, a Letter from the Commissioner of Correction to Stephen Knowlton of CBH Medical P.C., dated June 28, 2016, was produced. Callahan Aff., Ex. C. That Letter sets forth the view of the Commission that there had been an unwarranted denial by Correctional Medical Care of the critical issues contained in the report. *Id*. In particular, the Letter states: "The Medical Review Board finds that your denial of critical failures is symptomatic of a healthcare delivery system that does not meet acceptable community standards." *Id.* The Report was then issued in final form without changes, and that Final Report is available to the public. *Id.*

## II. THE SUBPOENA

The Plaintiff's Counsel, through the course of discovery, has obtained the Commission of Correction's Final Report, and other documentation, relative to Mark Cannon. Dkt. Nos. 16 & 33-3. Nevertheless, on March 31, 2017 Plaintiff's counsel transmitted, via email, a Rule 30(B)(6) deposition notice to the Commission of Corrections. Callahan Aff., Ex. C. The notice required that the Commission produce a witness knowledgeable on the following subjects:

1. The origin and operations of the [Commission of Correction] medical review board.
2. The efforts of the Medical Review Board to address prior inmate deaths at local jails where Correctional Medical Care and/or CBH Medical provide medical and/or mental healthcare.
3. The response to [sic] [Correctional Medical Care] or CBH to those efforts.
4. Any and all reasons why Commission of Correction is of the opinion that Correctional Medical Care and/or CBH medical maintains a healthcare system that "does not meet community standards."

*Id.*

In a Letter, dated April 5, 2017, General Counsel for the Commission of Correction objected to the subpoena on several grounds, including the fact that there is no single individual who could speak on behalf of the Commission, and that the proposed testimony would constitute disclosure of an unretained expert opinion. *Id.*, Ex. F. When the Counsel for the Commission and Plaintiff's Counsel were unable to come to an agreement, the present Motion to Quash was filed. Dkt. No. 93.

## III. DISCUSSION

With regard to the scope of federal discovery, it is now well-settled that discovery must be "proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). Federal Rules of Civil Procedure 45(d)(3)(A)(iv) and (B)(ii) protect against subpoenas that "subject[] a person to undue burden" or calls for an unretained expert's opinion. Further, Rule 26(b)(2)(C)(I) notes that a court must limit discovery that "can be obtained from some other source that is more convenient, less burdensome, or less expensive[.]"

"[M]otions to quash a subpoena are . . . entrusted to the sound discretion of the district court." *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (citation omitted). "[T]he party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings. . . . Once the party issuing the subpoena has demonstrated the relevance of the requested documents, the party seeking to quash the subpoena bears the burden

of demonstrating that the subpoena is overbroad, duplicative, or unduly burdensome." *Libaire v. Kaplan*, 760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011) (internal quotation marks and citations omitted).

In addition to the foregoing, proposed deposition testimony of a high-level governmental official is subject to special review by the courts. *New York v. Oneida Indian Nation of New York*, 2001 WL 1708804, at *3 (N.D.N.Y. Nov. 9, 2001). Such depositions "are permitted on a showing that (1) the deposition is necessary in order to obtain relevant information that cannot be obtained from any other source and (2) the deposition would not significantly interfere with the ability of the official to perform his governmental duties." *Id*. (citing, *inter alia*, *Marisol A. v. Giuliani*, 1998 WL 132810, at *2 (S.D.N.Y. Mar. 23, 1998)); *see also Bey v. City of New York*, 2007 WL 3010023 (S.D.N.Y. Oct. 15, 2007) (holding that the retired Commissioner of the New York City Department of Corrections was a high level government official).[3] A deposition will be considered necessary under the first prong when "the official's testimony will likely lead to discovery of admissible evidence" and the official has "unique personal knowledge that cannot be obtained elsewhere." *Marisol A. v. Giuliani*, 1998 WL 132810, at *3.

Applying these standards to the present fact pattern, the Court is led to the conclusion that the present deposition subpoena should be quashed. As noted *supra*, the Report itself, with its recommendations critical of Correctional Medical Care, has already been obtained by Plaintiff's Counsel. Indeed, as noted in the Commission's Letter, dated June 28, 2016, such reports become public documents once they are placed in final form. Callahan Aff., Ex. C. And, as a governmental report, the document(s) is presumptively admissible at trial as an exception to the hearsay rule. FED. R. EVID. 803(8); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).

---

[3] Plaintiff has not argued that members of the Commission of Correction are not high level governmental officials.

Thus, what is at issue with this deposition subpoena is not the Report itself, which could be highly relevant, but rather the facts and the deliberative process that led the Commission and the Medical Review Board to make its recommendations, and in particular, to question Correctional Medical Care's ability to provide quality medical care. It is evident, however, that the Commission itself had no unique personal knowledge of the Cannon matter, Callahan Aff. at ¶¶10 & 11, or of any related Correctional Medical Care case, and instead based its conclusions the Medical Review Board's expertise and upon records, videos, and witness statements that are no doubt equally available to Plaintiff's Counsel. Further, insofar as there were other investigations critical of Defendant Correctional Medical Care, Inc., conducted by the Commission of Correction, those Final Reports would also be separately available to Plaintiff's Counsel.[4]

In a substantially similar case in the Eastern District of New York, the Defendant Suffolk County sought to depose five members of the Medical Review Board and issued a subpoena for that purpose. *Scott v. County of Suffolk*, 2008 WL 4890577 (E.D.N.Y. Oct 31, 2008). The New York Attorney General's office opposed enforcement of the subpoena, relying upon the "no other source standard" and the court agreed with that rationale. *Id.* at *1. In particular, the court was swayed by the fact that there was no showing that the subject matter of the proposed deposition – regarding "specialized information [that] was consulted to reach the conclusions that appear in the report" – was not available elsewhere, or was a proper subject of the deposition. *Id.*

An identical impediment is present in this case, as the Plaintiff's Counsel already possesses the highly detailed Final Report on the death of Mark Cannon, as well as all other Commission of Correction reports concerning Correctional Medical Care, Inc. Counsel also has access to

---

[4] In fact, the proposed Amended Complaint that was filed with the Court included copies of eighteen separate Commission of Correction Final Reports that Plaintiff intends to rely upon. Dkt. No. 33.

Correctional Medical Care's response to the Final Report, as well as the Medical Review Board's criticism of that response. Beyond that, Plaintiff's Counsel also possesses a twenty-eight page "Assurance of Discontinuance" agreement between the Office of the Attorney General and Correctional Medical Care calling for penalties, restitution, audits and an on-site monitoring, as well as a fifty-page report form Public Health Solutions entitled "Retrospective Review of Health Care Services at Albany County Correctional Facility" which audit report covers the period of May 22, 2014 to September 22, 2014. Nothing in the papers submitted to the Court identify any particular information that might be possessed by the Commission or the Board that cannot be obtained readily through some other source, or that would warrant the imposition of the time and expense of the proposed deposition.

The deposition subpoena in question presents a myriad of other practical and procedural problems. Initially, and as noted by the Commission's General Counsel, as of 2016, the Commission consisted of a three-member panel and the Medical Review Board was comprised of six members and a Chairwomen. Callahan Aff. at ¶¶ 5 & 7. Accordingly, no one member could be the definitive spokesperson for the entire panel concerning their decisional thought process. Of course, the Report itself, as the final product, is definitive, but the Plaintiff's Counsel already possesses that Final Report. In addition, Phyllis Harrison- Ross, M.D., who was the signatory of both the Final Report as well as a June 28, 2016 Letter cited by Plaintiff, and who also was chair of the Medical Review Board, passed away on January 15, 2017, and therefore is unavailable to be deposed.

This leads to the second issue. What is being sought by the deposition testimony appears to be testimony of an unretained expert and is properly quashed for this additional reason. As noted

by the subpoena, Plaintiff is looking to seek confirmation that Correctional Medical Care, or its affiliate, does not provide the type of care that meets appropriate standards. Testimony regarding whether there has been a deviation from accepted medical standards is quintessentially expert in nature. *See, e.g., Oliver v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183,190 (2d Cir. 2005) (noting that "a plaintiff ordinarily must introduce expert testimony to establish the relevant medical standards that were allegedly violated" and "without expert assistance a jury will often have no understanding of what constitutes reasonable behavior in a complex and technical profession such as medicine.") (internal quotation marks and citations omitted). This would be true regarding the specific care provided to Mr. Cannon, as well as of the general proposition of Correctional Medical Care's competence as a facility medical provider. Plaintiff notes that he has obtained his own experts on these issues. Keach Aff. at ¶ 3.

Plaintiff's Counsel's attempt to create a legal dichotomy by claiming that he is only seeking *facts* from the Commission and its Medical Review Board, and not an expert *opinion*, is simply not a compelling argument. In his Memorandum of Law, Plaintiff's Counsel specifically notes that the Commission "issued strong *opinions* regarding [Correctional Medical Care's] wrongdoing" and that he is seeking to depose an individual who is "knowledgeable about these facts that led the Commission to reach this *opinion.*" Dkt. No. 101-2 at pp. 3 & 5 (emphasis added). Expert testimony often involves both conclusions and the factual basis for those conclusions. FED. R. EVID. 703. While some factual testimony may be solicited here, it appears that "the primary purpose of the testimony would be to present expert opinion evidence." *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 304 F.R.D. 379, 383 (S.D.N.Y. 2015). Without the proper expert retention and disclosure, such deposition would be inappropriate.

Nor is it clear that the 30(b)(6) witness would even be required to provide the information sought. Courts have recognized a deliberative process privilege, which is meant to protect the decision-making process by encouraging the free flow of information so that there might be an unrestricted analysis upon which a final decision may could be based. *Oneida Indian Nation of New York*, 2001 WL 1708804, at *6. This privilege applies to communications that are both pre-decisional and deliberative. *Id.* The information sought by the Plaintiff – to wit, the thought process and facts by which the Commission came to the conclusion that Correctional Medical Care might be incapable of providing adequate healthcare – certainly falls within this category. *Id.* Moreover, the end result of a lengthy deposition process may well be that the Commission is less effective in doing what even the Plaintiff's counsel describes as good work; protecting inmate safety and ensuring quality care. As noted in other cases, if high ranking officials, such as the head of a government agency, were routinely deposed, he or she would be "spending their time giving depositions and would have no opportunity to perform their functions." *Marisol A. v. Giuliani*, 1998 WL 132810, at *3 (citations omitted). The Court takes judicial notice that, according to the Commission of Corrections End of Year Report for the calendar year 2015, the Commission received 3315 reportable incidents, including thirteen inmate deaths and 763 inmate assaults. *See* New York State Commission of Correction Annual Report for the year 2015, *available at* http://www.scoc.ny.gov/pdfdocs/annualreport_2015.pdf. For a court to authorize depositions in even a small portion of those cases, which of course would include the time necessary to prepare for such deposition, would, in this Court's opinion, be a significant burden on the Commission. That is not to say that such depositions of members of the Commission of Correction would not be

authorized in a proper case, but simply that after balancing the relevant factors, the Court concludes that this is not such a case.

**WHEREFORE**, it is hereby,

**ORDERED**, that the Motion of the Commission of Correction to Quash Plaintiff's Subpoena (Dkt. No. 93) is hereby **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court remove the restrictive filing associated with the Motion to Quash as the Court has reviewed its contents and deems nothing therein to be properly shielded from the public's review.[5]

**IT IS SO ORDERED**.

Date: June 27, 2017
      Albany, New York

_____
Daniel J. Stewart
U.S. Magistrate Judge

---

[5] *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).